IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF:<br><br>SPECIALITY RETAIL SHOPS HOLDING CORP., *et al.*,<br><br>      Debtors. | 8:19CV504<br><br>MEMORANDUM<br>AND ORDER |
| CGP CANADIAN, LTD.; CGP CLIFTON, LTD.; CGP COMANCHE, LTD.; CGP COTULLA, LTD.; CGP JACKSBORO, LTD.; CGP OROFINO, LLC.; CGP PROSSER, LLC; CGP SEYMOUR, LTD.; GGSK TULIA, LTD.,<br><br>      Appellants,<br><br>  v.<br><br>SUN CAPITAL PARTNERS GROUP, INC.; SUN CAPITAL PARTNERS, IV, LP; SUN CAPITAL MANAGEMENT, LLC; and KLA-SHOPKO, LLC,<br><br>      Appellees. | |

  This matter is before the Court on appellant-creditor CGP's[1] appeal (Filing No. 1) from a decision of the bankruptcy Court[2] ("bankruptcy court") granting Sun Capital's[3] "Motion Pursuant to Confirmation Order to Determine Whether Causes of Action are

---

  [1] The appellants in this case are CGP Canadian, LTD.; CGP Clifton, LTD.; CGP Comanche, LTD.; CGP Cotulla, LTD.; CGP Jacksboro, LTD.; CGP Orofino, LLC; CGP Prosser, LLC; CGP Seymour, LTD.; and GGSK Tulia, LTD (collectively, "CGP").
  [2] The Honorable Thomas Saladino, Chief Bankruptcy Judge for the United States Bankruptcy Court in the District of Nebraska.
  [3] The appellees are Sun Capital Partners Group, Inc., Sun Capital Partners, IV, LP, Sun Capital Management, LLC, and KLA-Shopko, LLC (collectively, "Sun Capital").

Property of the Debtor's Estate." With jurisdiction under 28 U.S.C. § 158(a)(1) and (c)(1)(A), the Court affirms.

I.  **BACKGROUND**[4]

This case arises out of Shopko's[5] Chapter 11 Bankruptcy, corresponding settlement agreement with its former majority shareholder Sun Capital, and a separate lawsuit initiated by CGP against Sun Capital.

    A.  **The Shopko Bankruptcy and Settlement with Sun Capital**

Shopko once operated over 300 retail stores throughout the United States. In 2005, Sun Capital and its affiliates acquired equity in Shopko. Over the next fourteen years, Sun Capital took control of Shopko and depleted most of its assets. As CGP sees it, "Sun Capital installed a puppet management team which loaded Shopko with debt and stripped it of most of its cash and assets through 'management fees' and various other tactics" until Shopko eventually filed for bankruptcy on January 16, 2019.

As part of the bankruptcy proceedings, a committee of independent directors (the "special committee") investigated the dealings between Shopko and Sun Capital. The special committee acted as the trustee of Shopko's estate and examined, among other things, the dividend payments and management fees paid by Shopko to Sun Capital. The special committee considered whether to sue Sun Capital for fraudulent transfer, breach of fiduciary duty, breach of contract, unjust enrichment, illegal dividend transfer, and other related claims.

---

[4]The Court has presented all facts as asserted and viewed in the light most favorable to CGP. *Dadd v. Anoka County*, 827 F.3d 749, 754 (8th Cir. 2016)

[5]The debtors include Specialty Retail Shops Holding Corp., Pamida Stores Operating Co., LLC; Pamida Transportation, LLC; Penn-Daniels, LLC; Place's Associates' Expansion, LLC; Retained R/E SPE, LLC; Shopko Finance, LLC; Shopko Gift Card Co., LLC; Shopko Holding Company, LLC; Shopko Institutional Care Services Co., LLC; Shopko Optical Manufacturing, LLC; Shopko Properties, LLC; Shopko Stores Operating Co., LLC; and SVS Trucking, LLC (collectively, "Shopko").

Ultimately, the special committee negotiated a $15,500,000 settlement on behalf of Shopko's estate with Sun Capital (the "settlement") in May 2019. Shortly thereafter, CGP sued Sun Capital in the United States District Court for the Southern District of Florida (the "Florida lawsuit"). The complaint in the Florida lawsuit alleges many of the same facts and circumstances surrounding the settlement—that is, the funneling of funds from Shopko to Sun Capital. Because Shopko and Sun Capital already settled and released all claims related to the transfers, Sun Capital and CGP agreed to have the bankruptcy court determine whether CGP could pursue those Florida lawsuit claims outside the bankruptcy proceedings. The Florida lawsuit was stayed pending the bankruptcy court decision and this appeal.

### B.   CGP's Claims Against Sun Capital

Before bankruptcy, Shopko began a new expansion campaign in 2013 to open smaller stores in rural locations, called "Shopko Hometown Stores." To develop some of these new stores, Shopko contracted with CGP to build out its real estate and lease the premises back to Shopko. CGP agreed to pay Shopko tenant-improvement funds, totaling approximately $4 million for nine store locations, "to be used by [Shopko] for maintenance, repairs, fixtures, and alternations to the Premises."[6]

CGP states it was fraudulently induced to make these payments to Shopko. In the Florida-lawsuit complaint, CGP alleges Shopko, at the ultimate direction of Sun Capital, told CGP the tenant-improvement funds would be a worthwhile investment because Shopko was "going to go public" and the value of the leases would "skyrocket." Under that impression, CGP entered nine leases with Shopko for Shopko Hometown locations between January 2015 and March 2016. CGP built out the Shopko Hometown stores, paid

---

[6]Sun Capital disputes the accuracy of the stated purpose for the tenant-improvement funds. They point to four of the leases in the record, noting that only one contains the language stated by Sun Capital in the complaint and repeated above. The other leases lack a stated purpose for the funds and state, almost identically, that "Landlord shall pay a tenant allowance to Tenant in the amount of $500,000."

the tenant-improvement funds to Shopko, and Shopko opened and operated the nine locations.

CGP learned of Shopko's precarious financial position around July 2016 and slowly began selling some of the developed properties, often at undesirable prices. CGP now asserts that Shopko, at the time of negotiations to develop the Shopko Hometown stores, knew the "stores would not be viable or profitable" and the true "purpose of developing those locations was to extract [tenant-improvement] money" to pass on to Sun Capital. CGP states the tenant-improvement funds were not used as promised in the contracts but were redirected to Sun Capital as part of its overarching scheme to "loot" Shopko of its assets.

Based upon the above transactions, CGP filed the Florida lawsuit against Sun Capital for its alleged involvement in the dealings between Shopko and CGP. CGP sued Sun Capital for violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1969(3) and 1962(c); conspiracy to violate RICO, 18 U.S.C. § 1962(d); common-law fraud; and unjust enrichment.

### C. The Bankruptcy Court's Decision and Issues on Appeal

After CGP filed the Florida lawsuit, Sun Capital and CGP disputed whether CGP could assert its claims because they appeared to be released by the settlement. To resolve this issue, the parties jointly agreed to have the bankruptcy court determine "whether [CGP's] Causes of Action are or were: property of the Debtors or their Estates, subject to the automatic stay, and/or were released by the Debtors, the Reorganized Debtors, the Plan Administrator, or their Estates under Article X.D of the Plan [settlement]."

The bankruptcy court determined that CGP's claims in the Florida lawsuit were derivative of the claims released and settled by Shopko's estate and the Special Committee. The bankruptcy court found CGP's allegations were derivative of the injuries to Shopko and its creditors in general. So, the claims—in substance—were property of the estate, and

they were ultimately released by the settlement between Shopko's estate and Sun Capital. CGP thus lacked standing to bring the same allegations against Sun Capital.

CGP next filed a First Amended Complaint in the Florida lawsuit to add additional details to their allegations and moved the bankruptcy court to reconsider. The bankruptcy court again ruled in favor of Sun Capital, and CGP appealed both rulings to this Court.

On appeal, CGP raises three issues. First, CGP contends the bankruptcy court erred in concluding the causes of action against Sun Capital are property of the estate, arguing their injuries are individualized and direct. Second, CGP claims the bankruptcy court erred in finding their claims against Sun Capital were within the scope of the settlement between Shopko's estate and Sun Capital. Finally, as CGP sees it, "the bankruptcy court erred in concluding that [CGP]'s Complaint and Amended Complaint [in the Florida lawsuit] should be dismissed due to lack of standing."

## II. DISCUSSION

### A. Standard of Review and Jurisdiction

The Court reviews the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. *In re Peabody Energy Corp.*, 958 F.3d 717, 721 (8th Cir. 2020). The Court has jurisdiction to hear appeals from final orders of the bankruptcy court where a party timely elects to have the appeal heard by this Court. *See* 28 U.S.C. § 158(a)(1) and (c)(1)(A).

### B. CGP's Claims are Property of the Debtor Shopko's Estate

In the Florida lawsuit, CGP asserted Sun Capital violated RICO based on wire and mail fraud, conspired with Shopko to violate RICO, committed common-law fraud and was unjustly enriched. CGP's complaint from the Florida lawsuit was brought before the bankruptcy court for review under Rule 12(b)(6) and Rule 9(b) standards on a motion to determine whether CGP's claims are property of Shopko's estate.

The bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "Causes of action are interests in property and are therefore included in the estate," and so the trustee is responsible for asserting those claims. *In re Senior Cottages of Am., LLC*, 482 F.3d 997, 1001 (8th Cir. 2007). Causes of action belonging to the estate generally include those "against corporate principals for alleged misconduct, mismanagement, or breach of fiduciary duty, because these claims could have been asserted by the debtor corporation, or by its stockholders in a derivative action." *Id.* (quoting *In re Ozark Rest. Equip. Co.*, 816 F.2d 1222, 1225 (8th Cir. 1987); *see also Pepper v. Litton*, 308 U.S. 295, 306-07 (1939) ("While normally that fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee.").

"If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim." *St. Paul Fire and Marine Ins. Co., v. PepsiCo, Inc.*, 884 F.2d 688, 700-01 (2d Cir. 1989); *see also Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1042 (2d Cir. 1986) ("Making the pursuit of certain causes of action the sole responsibility of the trustee in bankruptcy furthers the fundamental bankruptcy policy of equitable distribution among creditors."). In the bankruptcy context, these are called "derivative claims" because they "arise[ ] from the harm done to the estate" and often "'seek [ ] relief against third parties that pushed the debtor into bankruptcy.'" *In re Tronox Inc.*, 855 F.3d 84, 100 (2d Cir. 2017) (quoting *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 89 (2d Cir. 2014)).

But when the creditor has a "claim for injury that is particularized as to them, they are exclusively entitled to pursue that claim, and the bankruptcy trustee is precluded from doing so." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995). An injury is particularized to the creditor when it is directly traceable to the third party's conduct. *In re Tronox*, 855 F.3d at 100; *St. Paul Fire*, 884 F.2d at 700 ("If the claims asserted by

6

[appellant] in this action are the property of the debtor . . . and if [appellant] has not alleged a direct injury traceable to [appellee], [appellant] does not have standing to assert those claims outside of the bankruptcy proceeding."). To distinguish between derivative claims and direct claims, the Court must look beyond the labels of the creditor's claims in its complaint and inquire into the substance of the allegations. *In re Tronox*, 855 F.3d at 100 ("[P]laintiffs often try, but are not permitted, to plead around a bankruptcy.").

CGP initially asserts these claims cannot possibly be the property of the debtor's estate because Shopko lacked standing to assert these claims against Sun Capital based on the *in pari delicto* defense.[7] CGP claims "if the Debtors [Shopko] were to sue Sun Capital and make the same allegations as [CGP], such claims would be barred by *in pari delicto*." On this point, CGP is mistaken. *In pari delicto* is an equitable defense, and the Eighth Circuit has "declined to conflate the constitutional standing doctrine with the *in pari delicto* defense." *In re Senior Cottages*, 482 F.3d at 1004. Indeed, "even if [the *in pari delicto* defense] appears on the face of the complaint, it does not deprive the trustee of constitutional standing to assert the claim." *Id.* In other words, Shopko's Special Committee, acting as its trustee, had standing to pursue (and already settled) its claims against Sun Capital. CGP's allegations of conspiracy do not impact this result.

CGP alternatively argues they can assert independent claims against Sun Capital because "Sun Capital and certain unnamed Debtors conspired together to defraud CGP Landlords." CGP alleges Shopko, at the direction of Sun Capital, negotiated for millions of dollars in tenant-improvement funds and redirected those funds to Sun Capital. Because Shopko did not use the tenant-improvement funds "as promised" when the funds were diverted to Sun Capital through management fees and dividend payments, CGP's injuries, they claim, were direct and individualized.

---

[7]The *in pari delicto* defense is similar to the doctrine of "unclean hands," as it prevents "a plaintiff who participated in the wrongdoing" from "recover[ing] damages based on the wrongdoing." *In re Senior Cottages*, 482 F.3d at 999, n. 3.

7

Conversely, Sun Capital urges the Court to look beyond the titles of CGP's claims and find the harm allegedly suffered by CGP is derivative of Shopko's bankruptcy. Sun Capital argues the gravamen of CGP's arguments are that the tenant-improvement funds were ultimately transferred to Sun Capital to partially finance dividends and a management fee. The substance of CGP's claims match those that were settled between Shopko and Sun Capital; the settlement released all claims for fraudulent transfer and improper dividends. *See*, *e.g.*, *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 589 n. 9 (5th Cir. 2008) ("A typical fraudulent transfer claim is perhaps the paradigmatic example of a claim that is 'general' to all creditors."). To the extent CGP alleges a fraud claim, Sun Capital argues CGP did not plead any such claim against it with particularity such that a court could find Sun Capital directly committed fraud against CGP.

CGP relies largely on *Hirsch*, 72 F.3d 1085; *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988); and *Cumberland Oil*, 791 F.2d 1037, to support the argument that their injuries are direct and particularized. The specific facts supporting direct harm in those cases do not appear here.

In *Hirsch*, a debtor's trustee sued the debtor's alleged partner in a Ponzi scheme, Arthur Andersen & Co ("Arthur Andersen"). *Hirsch*, 72 F.3d at 1089. In perpetrating the fraud as part of that scheme, Arthur Andersen distributed misleading information directly to investors. *Id.* The district court found the claim against Arthur Andersen belonged to the investor-creditors because Arthur Andersen induced them to invest in the scheme. *Id.* at 1094-95. The injuries suffered by the investors were specifically traceable to Arthur Andersen's false statements.

In *Bankers*, three owner-directors of the debtor fraudulently sold and concealed a major asset before initiating bankruptcy. *Bankers*, 859 F.2d at 1099. By directly concealing that transfer from Bankers Trust Company ("Bankers") (the debtor's largest creditor), Bankers agreed to the bankruptcy plan; only later did Bankers learn of the fraud. *Id.* The district court found Bankers suffered a direct and particularized injury and could

8

maintain a suit against the three owner-directors personally for their fraudulent concealment of assets in the bankruptcy proceeding. *Id.* at 1101. Similarly, in *Cumberland Oil*, the creditors "alleged with particularity that misrepresentations of facts were made by [defendant] in furtherance of a conspiracy to defraud" the creditors. *Cumberland Oil*, 791 F.2d at 1043.

Unlike the above-mentioned cases, CGP fails to allege Sun Capital caused any "injury that is particularized as to them" or that CGP suffered a "direct injury" at the hands of Sun Capital. *In re Tronox Inc.*, 855 F.3d at 99. Generally stating—without any specifics—that Sun Capital "conspired with" or "directed" Shopko to seek tenant-improvement funds does not amount to a particularized claim that Sun Capital fraudulently induced CGP to enter into the lease contracts with Shopko. *See Madoff*, 740 F.3d at 92-93. CGP pleads nothing more than Sun Capital fraudulently withdrew funds from Shopko, to the detriment of Shopko and all its creditors. Looking beyond the labels of CGP's claims, the Court finds CGP's allegations echo those made by the Special Committee against Sun Capital. *Id.* (noting that a court should be "wary of placing too much significance on the labels appellants attach to their complaints"). CGP's allegations are general to all Shopko creditors, and the Court will not allow CGP to circumvent the bankruptcy proceedings. The bankruptcy court properly classified CGP's claims as generalized derivative claims that are property of the estate.

### C. CGP's Claims were Released in the Settlement

After a careful review of the settlement, the Court agrees with the bankruptcy court that it is broad enough to include CGP's allegations against Sun Capital. The settlement released all claims and causes of action "made, or which could have been made," against Sun Capital that "in any way related to the Debtors." Because CGP's allegations were substantively identical to those of the Shopko estate, CGP's claims were also released in the settlement.

### D. The Bankruptcy Court's Jurisdiction and Decision

In CGP's reply brief, they raise for the first time that the "Bankruptcy Court had no jurisdiction to determine the sufficiency of the fraud allegations in the Complaint or the legal standing of the CGP Landlords in a lawsuit pending in the Florida Federal Action." CGP misconstrues the bankruptcy court's order, and the Court finds this assertion is without merit.

At the outset, CGP agreed the bankruptcy court had jurisdiction to decide whether CGP's causes of action were property of Shopko's estate, and if so, would be subject to an automatic stay or the release executed as part of the settlement. CGP now makes the incredible allegation that "the Bankruptcy Court acted without jurisdiction in determining that the Florida Federal Action should be dismissed under Rule 9(b)," but the bankruptcy court simply did not make that determination. In deciding if the claims were property of the estate, the key issue the bankruptcy court needed to resolve was whether CGP sufficiently alleged Sun Capital committed fraudulent acts *directed* at CGP. This necessarily involved reviewing the sufficiency of the allegations in the complaint.

CGP next alleges the bankruptcy court exceeded its authority by asserting CGP lacked standing to assert its RICO and fraud claims in the Florida lawsuit. To the contrary, the bankruptcy court only decided the question posed by the parties and refused to dictate how the Florida Federal Court should proceed. The bankruptcy court stated as follows:

> Now, let me say this. Far be it for me to tell an Article III Court what to do down there in Florida. This motion is simply because the confirmed plan said you can bring this motion for me to determine whether the causes of action in Florida are property of the estate and should be dismissed because plaintiffs lack standing to bring them. That's what I'm doing.
>
> I don't know and I am not going to rule on whether the plaintiffs can amend their complaint in Florida and somehow come up with some direct cause of action as to Sun Capital. I am ruling solely on the complaint that's been put in front of me and the motion that's been put in front of me.

> Again, far be it for me to tell an Article III Court what it can or cannot do. But as far as I'm concerned, the causes of action are property that as currently pled in, or is it pleaded, in the Florida complaint, are property of the debtors' estate and the debtor – the plaintiffs lack standing to bring them.

The bankruptcy court found the property was part of the debtor Shopko's estate, and so the Shopko trustee was the exclusive party who may bring those claims against Sun Capital. The bankruptcy court made clear it did not "determin[e] that the Florida Federal Action should be dismissed under Rule 9(b) and due to lack of standing" as CGP alleges in its brief.

### III. CONCLUSION

The Court affirms the decision of the bankruptcy court in deciding that CGP's claims, as alleged in the Florida lawsuit, are property of Shopko's estate. 11 U.S.C. § 541(a)(1). CGP failed to allege facts to support its assertion that its injuries were individual and direct claims rather than general claims faced by all creditors; therefore, the claims could only be brought by Shopko's trustee. In resolving the bankruptcy, Shopko appointed the Special Committee to serve as its trustee, and it already settled and released all claims against Sun Capital. The bankruptcy court did not exceed its authority in deciding these issues, and its order is affirmed.

Dated this 2nd day of December 2020.

BY THE COURT:

Robert F. Rossiter, Jr.
United States District Judge